## W. S. WISHARD v. STATE.

No. A-449.    Opinion Filed May 2, 1911.

Petition for Rehearing Denied June 19, 1911.

1.    FORGERY—Indictment—Sufficiency. An indictment drawn under section 2560, Snyder's Sts., charging the forgery of a deed with intent to defraud, set out as a purport clause, "being and purporting to be the act of other persons, to wit: one John Rossiter, one J. E. Rossiter and one Julia Rossiter"; in the tenor clause, the deed is set out in haec verba, and the grantors therein named are "J. M. Rossiter and Julia Rossiter, his wife and J. C. Rossiter a single man," and the signatures thereto, J. M. Rossiter, Julia Rossiter and J. C. Rossiter, the clause alleging intent to defraud, and the clause alleging right and interest in the real property affected, names John Rossiter, J. C. Rossiter and Julia Rossiter. Held sufficiently direct and certain, and demurrer thereto properly overruled; also that it is sufficient to sustain a conviction of the crime charged.

2. **INDICTMENT—Formal Requisites.** An indictment for an offense committed under the laws of Oklahoma Territory, returned after the admission of the state into the Union, should be in the name of "The State of Oklahoma," and conclude; "Contrary to the form of the statute is such case made and provided and against the peace and dignity of the State of Oklahoma."

3. **EVIDENCE—Judicial Notice—Land Surveys.** Courts take judicial notice of governmental surveys and subdivisions of land thereunder, and will take judicial knowledge of the fact that the land described in the indictment is in existence.

4. **FORGERY—Indictment—Sufficiency.** It is not necessary to set out in an indictment charging the forging of a deed the title of the persons intended to be defrauded.

5. **PARTIES TO OFFENSES—Accessories—Principals.** The statute abolishes the distinction between accessories before the fact and principals. By it (sec. 2045, Snyder's Sts.) "all persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission though not present, are principals." As the acts of the principal are made the acts of such accessory, the latter may be charged as having done the act himself, and may be indicted and punished accordingly.

6. **FORGERY—Procuring Another to Commit Act.** A person who procures another to forge the name of one is as guilty as if he had done it himself.

7. **CONSPIRACY—What Constitutes.** A conspiracy may be defined, generally, as a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful, by criminal or unlawful means.

8. **EVIDENCE—Acts of Co-conspirators.** As a general rrule, where there is evidence of a conspiracy to commit a crime, and of its subsequent commission, the state may, and in support and corroboration thereof, show any act of the alleged conspirators intermediate the conspiracy and the crime, which apparently recognizes the existence of the conspiracy and reasonably indicates preparation to commit the crime, or preserve its fruits; and this, notwithstanding such special act or preparation was not the one discussed or agreed upon by the conspirators.

9. **TRIAL—Instructions—To be Considered Together.** Where an instruction, considered by itself, is too general, yet if it is properly limited by another instruction and the instructions considered and construed together fairly and fully state the law, this is sufficient, the principle that an instruction which is general in its character may be limited or qualified by other instructions given, does not contravene the rule that material error in one in-

struction calculated to mislead is not cured by a subsequent contradictory instruction.

10.  **TRIAL—Remarks of Judge to Jury.** When the jury returned into court the judge inquired if they had arrived at a verdict. One of their number stated, "We disagree in finding the cause of this forgery," whereupon the judge said that if they had not agreed they could retire for further deliberation, and added that if they could not agree they had all of the next week in which to deliberate. **Held,** that this was not error, when taken into consideration with othr circumstances in the case.

(Syllabus by the Court.)

*Appeal from District Court, Blaine County; G. A. Brown, Judge.*

W. S. Wishard, plaintiff in error (hereinafter designated defendant), was jointly indicted with J. C. Evans and P. F. Tyler for the crime of forgery as defined by sec. 2560, Snyder's Sts. He was convicted as charged and appeals. Affirmed.

Omitting caption and endorsements, said indictment is as follows:

"Of the December, 1908, term, a term of the district court of the Seventeenth judicial district of the state of Oklahoma, held in and for the county of Blaine, in the state of Oklahoma, at the town of Watonga, and begun on the 30th day of November, in the year of 'our Lord, one thousand, nine hundred and eight, the jurors, of the grand jury of said county and state, good and lawful men having been first duly chosen, selected, drawn, summoned, returned, tried, empaneled, sworn and charged according to law to diligently inquire into and true presentment make within and for the body of said county of all public offenses against said state of Oklahoma, committed or triable in said county, in the name and by the authority of said state of Oklahoma, do present and find, that in said county of Blaine, in said —— of Oklahoma, on the 31st day of August, in the year one thousand nine hundred and six, one J. C. Evans, P. F. Tyler and W. S. Wishard, persons then and there being, did then and there wilfully, intentionally, wantonly, unlawfully, feloniously, fraudulently and falsely, make, forge, and counterfeit, and cause to be made, forged and counterfeited, a certain instrument of writing, being and purporting to be the act of other persons, to wit: one John Rossiter, one J. C. Rossiter and one Julia Rossiter which said instrument of writing,

as aforesaid was and is in language, words, and figures, and of the following purport and effect, to wit:

"'From J. M. Rossiter *et al.* to Elwood Rossiter, Territory of Oklahoma, Blaine County—ss.: This instrument was filed for record on the 1st day of Sept., A. D. 1906, at 1:30 o'clock p. m., and duly recorded in Book D 19, page 198. Fee, $1.15. P. J. Leowen, Register of Deeds, ———, Deputy. [Seal.]

"'This indenture, made this 31st day of August, A. D. 1906, between J. M. Rossiter and Julia Rossiter, his wife, and J. C. Rossiter, a single man, of Blaine county, in the territory of Oklahoma, of the first part, and Elwood Rossiter, of the second part. Witnesseth: The said parties of the first part, in consideration of the sum of two thousand ($2,000.00) and no/100 dollars, the receipt whereof is hereby acknowledged, do by these presents, grant, bargain, sell and convey unto said party of the second part, his heirs and assigns all of the following described real estate, situated in the county of Blaine, and territory of Oklahoma, to wit: All of the northwest (N. W. ¼) quarter of section twenty-nine (sec 29), township seventeen (17), range thirteen (13) W., I. M., containing one hundred sixty (160) acres, more or less, according to the U. S. survey. To have and to hold the same, together with all and singular the tenements, hereditaments, and appurtenances, thereto belonging, or in any wise appertaining forever. And said grantors, J. M. Rossiter and Julia Rossiter and J. C. Rossiter, for themselves, and heirs, executors or administrators, do hereby covenant, promise and agree to and with said party of the second part, that at the delivery of these presents that they are lawfully seised in their own right of an absolute and indefeasible estate of inheritance, in fee simple, of and in all and singular the above granted and described premises, with the appurtenances; that the same are free, clear, discharged and unincumbered of and from all former and other grants, titles, charges, estates, judgments, taxes, assessments and incumbrances, of what nature or kind soever: Except one certain mtg. of eight hundred ($800.00) which grantee accepts and agrees to pay, and that they will warrant and forever defend the same unto said party of the second part, his heirs and assigns, against said parties of the first part, their heirs, and all and every person or persons whomsoever, lawfully claiming or to claim the same. In witness whereof, parties of the first part have

hereunto set their hands the day and year first above written. J. M. Rossiter. Julia Rossiter, J. C. Rossiter.

" 'Territory of Oklahoma, Blaine County—ss.: Before me, a justice of the peace, in and for said county and territory, on this 31st day of August, 1906, personally appeared J. M. Rossiter and Julia Rossiter and J. C. Rossiter, to me known to be the identical persons who executed the within and foregoing instrument, and acknowledged to me that they executed the same as their free and voluntary act and deed, for the uses and purposes therein set forth. Calvin Ford, Justice of the Peace. Commission expires ——, 190—.

" 'Territory of Oklahoma, Blaine County—ss.: I, John M. Tyler, county clerk of said county, hereby certify that Calvin Ford of Arapahoe township in said county is a duly elected, qualified and acting justice of the peace, in and for said county, and that his term of office began on the 1st day of Jan., 1905, and will end on the 31st day of December, 1906. Witness my hand and official seal at Watonga in said county of Blaine this 1st day of Sept., 1906. John M. Tyler, County Clerk of said County. [Seal.]'

—with the unlawful, wilful, fraudulent and felonious intent of him, the said J. C. Evans, and of him, the said P. F. Tyler, and of him, the said W. S. Wishard, to then and there cheat and defraud the said John Rossiter and the said J. C. Rossiter, and the said Julia Rossiter, and the said instrument of writing, so forged and counterfeited as aforesaid, being then and there an instrument of writing, by which the rights and property of the said John Rossiter, and the said J. C. Rossiter, and of the said Julia Rossiter, were, are and purported to be diminished and affected, and by which said false, fraudulent and felonious making, forging, and counterfeiting of said instrument of writing, as aforesaid, the said John Rossiter, and the said J. C. Rossiter, and the said Julia Rossiter, may be, and affected, bound and injured in their property.

"Contrary to the form of the Statute in such cases made and provided and against the peace and dignity of the State of Oklahoma."

Said indictment was presented and filed in open court on December 11, 1908. April 1, 1909, defendant filed a general demurrer which was overruled and exception allowed. Thereupon

defendant entered his plea of not guilty and demanded a severance.

October 5th, his case was called for trial. On October 9th, the case having been submitted to the jury, the jury returned into open court; all parties present. Thereupon the court inquired of the jury if they had arrived at a verdict. Whereupon one of their number stated: "We disagree in finding the cause of this forgery." Whereupon the court informed them that if they had not agreed they could return to their jury room for further deliberation, and also stated that "if they could not agree they had all of the next week in which to deliberate."

On October 11th, the jury returned a verdict of guilty. Motions for new trial and in arrest of judgment were duly filed. On October 16, 1909, said motions were overruled and the defendant was sentenced to serve a term of seven years at hard labor in the state penitentiary. Defendant appealed by filing in this court on April 9, 1910, his petition in error and case-made.

Upon the part of the state, evidence was given tending to establish the following facts:

This defendant, a white man, and his codefendants, negroes, were members of the Blaine county bar, and this defendant was appointed and occasionally acted as deputy county attorney during the year 1906, and as such official filed complaints against certain members of the Rossiter family, and then shared the fees received by his codefendant Tyler, acting as attorney for the Rossiters. That, in pursuance of this conspiracy to defraud Rossiters, the signatures to the alleged deed were forged, and the grantee named therein, Elwood Rossiter, immediately deeded said land to the defendants named in the indictment.

The testimony of J. M. Rossiter, first witness called by the state, was to the effect that in 1906, he lived on the land in question about sixteen miles northwest of Watonga; that in June of that year he went to Kansas, and returned the 11th of September; that the land described in the alleged forged deed belonged to witness J. M. Rossiter and his brother J. C. Rossiter; and identi-

fied a warranty deed (Exhibit "1"), which deed had been filed foɪ record on October 23, 1905, in the office of register of deeds of Blaine county, Oklahoma, showing their title. That he had not signed the deed in question and had no knowledge of its execution until after his return from Kansas. That Julia Rossiter was his wife, and went with him to Kansas and returned with him; that the grantee named therein, Elwood Rossiter, was his brother. That with his brother, J. (John) C. Rossiter, he went to defendant's law office shortly after his return from Kansas. The record here reads as follows:

"Q. Did you have any conversation with Wishard, then and there? A. We did. Q. What was that conversation? A. We went to Mr. Wishard's office and asked him what he was going to do with that paper or deed that he claimed to have on the place, that they claimed to hold. At first Mr. Wishard said he didn't have any such a paper and knew nothing of any such a paper; we told him we didn't see why his name should be on that paper and him know nothing about it, and then he said, at last, that he did know about the paper, but he said it was a forged deed and that it was no good anyway and that he didn't like to have any thing done with it; that it would cause him and the others trouble; and we told him we would settle it with him, we would make him over a deed of our own if he woud pay us for the place; he asked us what we would want for the place and we told him it was worth about $1,700.00; he said he believed he could get that for us and would get it; he said for us to wait a few days and not put any costs on to it, and that he would see the negroes, and for us to come back in a few days and that he would pay us for the place and would not cause any trouble about the place. Q. Was there anything further said in that conversation in refence to Evans or Tyler? A. He said, 'We sent Evans and Tyler there,' he says: 'We will get together and pay up on the plac⊕ and you ones can make us a deed to the place and that will be all that is to it'; he said, 'We don't want any trouble.' We told him we wanted the place and that is what we would want for it, and that we would sell it to him. Q. Did you have any conversation with Wishard after that? A. We did in about a week. Q. Where was that conversation? A. In his office. Q. Who was there then? A. John C. Rossiter, myself, and Mr. Wishard. Q.

What was said between you at that time? A. We wanted to speak to him about this deed that he claimed that they had, and he told us that he could not do anything for us; that the negroes would not do anything and that he could not stand it all himself and would not settle with us and would not pay us for the place; and we told him we would have to bring suit and set their deed aside."

Cross-examined, he stated that his wife, Julia Rossiter, his brother, John C. Rossiter, and his father, A. S. Rossiter, went with him to Kansas, leaving his mother, his brother, and some sisters on the farm. That his brother, J. C. Rossiter, is "John" and that witness J. M. Rossiter is "Jesse." He was then asked if the signature on an appearance bond given by him on the 27th day of June, 1906, upon a charge preferred against him' for the offense of perjury, upon which he was held to the district court, and marked defendant's exhibit "A.", was his signature. He answered that it was.

Julia Rossiter's testimony was, in effect, that she was the wife of J. M. Rossiter, and that John or J. C. Rossiter lived with them on their farm; that they were all in Kansas on August 31, 1906; that she never signed the alleged forged deed. That Cora Jones was her sister-in-law and Elwood Rossiter was her brother-in-law, and that she never authorized Elwood Rossiter or Cora Jones or any of the Rossiters to cause her name to be signed to such deed; that she had not seen Elwood Rossiter for a year and did not know where he was.

J. C. Rossiter's testimony was to the effect that he lived in Blaine county fifteen years; that in the year 1906 he was living on the land described in the alleged forged deed with his brother J. M. Rossiter; that together they owned this land under the deed marked exhibit "1", which deed is dated October 23, 1905, reciting that in consideration of the sum of five thousand dollars, the northwest quarter of section 29, township 17, range 13, West I. M., is hereby conveyed to J. M. and J. C. Rossiter, which deed was filed for record in the office of the register of deeds of Blaine county, on the date of its execution; that they were the owners

of said land on the 31st day of August, 1906, and that the alleged forged deed was executed and delivered without his knowledge or consent; that on said date he was with J. M. Rossiter and Julia Rossiter in the state of Kansas; that he was with his brother at the office of the defendant Wishard; and in substance repeated the conversation had, as testified to by his brother.

Theodore Graalman testified that he was register of deeds of Blaine county, and was asked to produce the record showing a deed of conveyance purporting to be signed by Elwood Rossiter conveying to P. F. Tyler, J. C. Evans, and W. S. Wishard title to the land in question, said deed purporting to be executed August 31, 1906, the acknowledgment of the signatures to the deed taken before I. H. Lookabaugh. Answered he could. He was then asked if the record showed to whom this deed was delivered after it was recorded, and answered that W. R. Kelly received said deed.

W. R. Kelly's testimony was, in effect, that he knew the defendants and Elwood Rossiter; and was then asked:

"Q. State whether or not you ever had in your possession a deed of conveyance purporting to be signed by Elwood Rossiter conveying to P. F. Tyler, J. C. Evans, and W. S. Wishard the title to the northwest quarter of section 29, township 17, range 13, W. I. M., Blaine county, Oklahoma, purporting to have been done August 31, 1906. A. Yes, sir."
—that he obtained said deed from Wishard, Tyler and Evans and placed it of record, and that he was the W. R. Kelly who received it from the register of deeds, after it was recorded. He was then asked if he had in his possession a deed of conveyance signed by W. S. Wishard, P. F. Tyler, and J. C. Evans, conveying the same land to Eliza A. Kelly, and said that he had not; that he at one time had possession of said deed and placed it of record, and received it from the register of deeds after it was recorded, but did not know where the deed was at this time.

On cross-examination, he stated that he might have sent the deed to his sister, Eliza A. Kelly, now living at Oklahoma City; that Tyler, Evans, and Wishard were present when he received the deed from them; that he was the notary public who took

the acknowledgment of the signatures of Wishard, Tyler, and Evans, of their deed to Eliza A. Kelly. That this deed was made after Elwood Rossiter had made his deed to Wishard, Tyler, and Evans.

Theodore Graalman, recalled, testified that as register of deeds he had in his possession deed record number 19, and, over the objection of the defendant, the record of a deed purporting to have been executed on the 31st day of August, 1906, by Elwood Rossiter, a single man, to P. F. Tyler and J. C. Evans and W. S. Wishard, naming a consideration of $2,500.00, conveying the northwest quarter, section 29, township 17, north, of range 13, W. I. M. The acknowledgment was taken by I. H. Lookabaugh, a notary public, and the instrument filed for record on September 1, 1906, at 1:40 o'clock, p. m. Also from said record a deed purporting to have been executed on the 1st day of September, 1906, by W. S. Wishard and P. F. Tyler and J. C. Evans, conveying the aforesaid described land to Eliza A. Kelly, for the named consideration of eight hundred dollars. The acknowledgments of W. S. Wishard, P. F. Tyler, and J. C. Evans were taken by W. R. Kelly, notary public. The instrument was filed of record on September 1, 1906, at 1:50 o'clock, p. m.

Emma Brown's testimony was, substantially, that on the 31st day of August she was at home with her mother on the land in question, and her name then was Emma Rossiter; that she is the sister of J. C. and J. M. Rossiter; that on August 31, 1906, J. C. Evans and P. F. Tyler were at their home; that Evans commenced writing a deed; that Evans signed John Rossiter's name to the same; that they all went to Calvin Ford's—Pete Tyler, J. C. Evans, witness, her sister Cora, and brother Elwood, and Gene Perryman. That Pete Tyler told Calvin Ford to sign the paper without reading it; that Tyler and Evans said then that they were going to town, and her brother Elwood and Gene Perryman started with them to Watonga.

Cora Jones' testimony was, substantially, that she was a sister of J. M. Rossiter and J. C. Rossiter, and was living at

home on the place in question on the 31st day of August; that P. F. Tyler and J. C. Evans were at the place on that day; that Evans brought some papers there and wanted her to sign them, and that she wrote the name of Julia Rossiter, as they told her to do, and Evans then took the papers with him; that Evans, Tyler, Perryman, and Elwood and Emma Rossiter and the witness then went to Calvin Ford's, a justice of the peace, about four miles distant; that Calvin Ford started to read the paper and Tyler would not let him read it and told him to sign it, which he did.

Cross-examined, she stated that her brother Elwood put one of the signatures on the deed, and that they went down to Calvin Ford to acknowledge a paper; that she did not know at that time what the paper was; that Tyler and Evans said they wanted a paper fixed up so that her father could come back.

The state rests. Thereupon defendant demurred to the sufficiency of the evidence and moved the court to direct the jury to return a verdict of not guilty, which was overruled by the ocurt, and exceptions allowed.

The theory of the defense in this case was that defendant did not procure and had nothing to do with procuring the forgery of the signatures of J. M. Rossiter, Julia Rossiter, and J. C. Rossiter, to the alleged deed, and, not being present when the transaction occurred, he could not be guilty of the crime of forgery as charged.

The first witness for the defendant was J. C. Evans, his codefendant, who had been tried and found guilty as charged in this indictment. His testimony was to the effect that he went with P. F. Tyler on August 31, 1906, to the home of the Rossiters and there wrote the body of the deed set forth in the indictment; that one Rossiter present represented himself as J. M. Rossiter, and a woman represented herself to be Julia Rossiter, and other persons present he took to be John Rossiter and Elwood Rossiter and their mother. That he did not see the name J. C. Rossiter written on the deed; that the deed was made to Elwood Rossiter

with the understanding that he was to come in to town and make
arrangements for the fee and have a bond signed for J. M.
Rossiter and A. S. Rossiter, who were then under a charge. That
Tyler said for them to come over to Calvin Ford's, when the
acknowledgment was there taken. He then returned to Watonga
with Tyler and Elwood Rossiter and Gene Perryman. Arriving
there, he left them; that he did not know that Elwood Rossiter
was going to make a deed to W. S. Wishard, P. F. Tyler, and
witness; that the next day he met Tyler, who said that Elwood
could not make the arrangements and he decided to deed the
land to us, and said the land is deeded to Wishard, you and
myself; that he had not been employed as an attorney in the Ros-
siter cases.

On cross-examination, witness said that he had since learned
that it was Cora Jones who signed the name of Julia Rossiter,
but he could not identify the Rossiter who signed the other name;
that they reached Watonga about half past ten o'clock that night;
as he understood it, Tyler was to receive three hundred dollars
as a fee and witness was to receive a part of this money as his
fee. That the Rossiters were on the "hike," but J. M. and John
were supposed to have come home at that time; that in addition
to the fee they were supposed to arrange for W. R. Kelly, to sign
the Rossiter bonds, and that Wishard, Tyler, and witness deeded
the land the next day to Eliza Kelly. That at that time the
three were together, and Tyler said, "Elwood has deeded this land
to us," and they then went to Kelly's office, and Wishard there
signed the deed with Tyler and witness; that he did not know
what arrangement Wishard had with Tyler.

Eugene Perryman's testimony was, in effect, that he knew
the Rossiter family for about fifteen years; that he was present
at their home on August 31, 1906, and went with Elwood Ros-
siter that night to Watonga; that Tyler and Evans came there
that day on his request; that Elwood Rossiter asked him to bring
them there, and he went there with them; that when they reached
Watonga they went to Mr. Lookabaugh's office; that it was then

about eleven o'clock; that Tyler had the deed with him, and Lookabaugh put his seal on another paper.

On cross-examination, he admitted that he had also been in Wishard's office several times before this transaction.

I. H. Lookabaugh's testimony was, in effect, that P. F. Tyler, Eugene Perryman, and Elwood Rossiter came to his office for the purpose of taking an acknowledgment to a deed, purporting to convey the land hereinbefore described; that the defendant Wishard was not with them; that he took the acknowledgment of Elwood Rossiter; that the deed was blank as to the names of the grantees and he called their attention to this, and they said they had not determined on that yet.

Miss Laura Ogan's testimony was, in effect, that she was working as a stenographer for defendant Wishard during the year 1906. That late in the fall J. M. and J. C. Rossiter came in his office and asked where he was; that Mr. Wishard came in and they said that they had some trouble some way, and they wanted to employ him to take charge of the case for them, and he told them that they would have to bring all the papers in before he could tell them what he would charge them; that there was nothing said about the Evans and Tyler deal pertaining to the Rossiter farm; that there was nothing said about paying seventeen hundred dollars for the farm, and that was the only time that Rossiters were in the office.

W. S. Wishard, defendant, took the stand on his own behalf and testified that he was an attorney actively engaged in the practice of law at Watonga for the past five years, had known his codefendant Tyler nine or ten years, and codefendant Evans five years; that he did not sign or ask any person to sign the names to the alleged forged deed; that the deed given by Elwood Rossited to Tyler, Evans, and witness was without his knowledge. The record then shows:

"Q. When did you first receive information that your name was in that instrument? A. The afternoon on my return home; I was walking up on Noble avenue, and Mr. Tyler, and I think,

Mr. Evans, called to me; they said they had a deed there to us, and I said I didn't want any real estate, and especially partnership real estate. Q. I will ask you what reason they gave to you for putting your name in that deed? A. Mr. Tyler done the principal part of the talking; they said that they were to make arrangements with Mr. Wheelock for money, but could not do so and they simply made it to us. Q. Had you been employed in any matter up to that time for the Rossiters? A. I had not. Q. What did he say was his reason for putting your name in there in advance of seeing you about it? A. Well, the reason, he said, to put it in there because they failed to get the money and they said my name was put in there and we could have the land. Q. I want to know what he said was the reason, you had not been employed before that time? A. He said they had to have a white man as attorney in this case; he said they were white men and he was colored and they had to have a white lawyer. Q. Had they spoken to you prior to this time to represent them? A. I hardly think they did; I think not. Q. Were you present at Mr. Lookabaugh's office when that deed was acknowledged or executed? A. I was not. Q. Were you present and saw your name at any time placed into that instrument? A. I did not. Q. Did you have any knowledge or information that either of those acts were going to be done before they were consummated? A. I did not. Q. I will ask you if you ever talked with Mr. Evans or Pete Tyler or either of them or both of them with relation to undertaking the making of any of these deeds prior to the time they were down and presented it to you? A. I did not. Q. You went on that same day and made a deed over to Mrs. Kelly, did you. A. Yes, sir. Q. I will ask you why that was done? A. Well, I don't know anything further than I said to them, 'I don't want any real estate, and especially partnership real estate.' They said, 'Sell it, then.' I said, 'All right'; and they went and talked with Mr. Kelly and I made the deed with them; Pete Tyler done the talking and came back and said they had made the deal. Q. I will ask you if you have any recollection of the occurrence of J. C. Rossiter or these two Rossiter boys coming into your office on the 10th of December, 1906? A. I cannot fix the date. They were there one time and I presume that is about correct; I recollect the incident. Q. Tell the jury what they came for and what they said and what you said and who was present? A. Miss Ogan, J. C. and Jesse Rossiter; they

were in the office and I came up; when I came in the office they introduced themselves to me; then I sat down and they had some matter out there in the country with some one,—I was not acquainted with but very few out there then,—it seemed to be some trouble, but I cannot think what it was, but at all events there was papers connected with it; they wanted to know what I would take the case for, and I told them they had better come in and bring the papers, then I could tell them more about it. Q. Was there anything in that conversation that pertained to this deed or matters involved in this land trouble that is involved in this indictment? A. There was not one single word said about that. Q. Did you at any time ever tell them that you laid the plans for this forgery and that this deed was a forgery? A. I never did."

On cross-examination the record is as follows:

"Q. What official position did you hold in the county along in June, 1906? A. I sometimes acted for Mr. Lowary in his absence, but I never acted for him when he was here and could act. Q. That does not answer the question. A. I suppose when I acted for him I acted as deputy county attorney. Q. Did you have authority to do that? A. Well, I never gave any bonds. Q. Were you appointed by him as deputy county attorney? A. I was at one time, yes, sir. Q. Did you act as deputy in June, 1906, if Mr. Lowary was absent? A. Well, yes. Q. If Mr. Lowary was gone in June were you acting in his absence? A. I might have acted for him. Q. You still were deputy county attorney in July, August, and September of that year? A. No, sir; I would not say I was; I would generally send in my resignation when he would come back so as not to hamper the business; I didn't get no salary for it and I didn't act only in his absence; I prosecuted two cases and he was with me in one case. Q. Wasn't it a fact that you were the only acting deputy county attorney Mr. Lowary had? A. I was not acting only when he was away out of the state; I acted for him, but as soon as he would return I would hand in my resignation again. Q. You had authority to act when you did act? A. I suppose I did. Q. Were you not regularly appointed in writing? A. Yes, in the first place I was appointed in writing. Q. Mr. Wishard, is it not a fact that you and Pete Tyler had some business dealing with the Rossiters or some of them relative to some litigation in August, 1906? A. Why, I rather think so; yes, I think so. Q. You did? A. Yes, sir. Q. That was the deal that

you got $200 out of the Rossiters, you and Pete? A. I got $100 for services, I think, in the old man Rossiter's case. Q. A. S. Rossiter's case? A. Yes, sir. Q. I understood you to say you did not know whether you knew him in August? A. It was not with him; I didn't see him in August that I know of. Q. Were you acting as his attorney? A. His son came to me and wanted me to represent him. Q. In what matter was that? A. That was the matter in which this complaint was filed against him. Q. Do you recollect what he was charged with in that case? No, I don't remember; I think it was perjury though. Q. Grand larceny? A. I think there was one grand larceny and one for perjury, too. Q. Were you and Pete employed generally in that case to get him a bond? A. No, Pete took the bond part; I was simply to represent him in court; that was all. Q. I now hand you 'Exhibit D' and ask you to examine that carefully; now is that the case in which this bond was given by A. S. Rossiter that you were employed by his son to look after his interests? A. Why, I can't just tell; there was two cases. Q. Was it this one then? A. This Exhibit 'D' was the case where D. R. Kelly signed the bond; yes, sir. Q. Is that the same case? A. It seems not; that was a $500 bond and this $1,000. Q. They are both cases of perjury? A. Yes, sir. Q. Did you look up these matters at that time? A. I tried to. Q. Did you? A. Yes, I went out there; yes, sir. Q. You knew Elwood then, did you? A. Never saw him until that day. Q. What day was that? A. I don't know; it was prior to this, but whatever day it was it was the first day I ever saw him. Q Where was that? A. That was at Perryman's. Q. Was that before they brought a criminal action against him? A. No, it seems that was the case it arose out of. Q .Do you know how many criminal cases were pending against A. S. Rossiter? A. I do not. Q. Do you know anything about the criminal cases that were pending against Jesse Rossiter? A. I didn't know there was any criminal cases at all against Jesse Rossiter at the time they spoke to us about A. S. Rossiter. Q. Do you recollect whether or not you were employed by A. S. Rossiter wherein he was charged with grand larceny? A. I don't remember. Q. Did that all happen about the same time? A. I think it did; I was to look after his matters. Q. His son employed you to look after his matters with reference to those prosecutions? A. Yes, sir. Q. I now hand the stenographer a written instru-

ment and ask that it be marked state's exhibit 'Z,' I now hand you exhibit 'Z' and ask you to state whether or not you ever seen that before? A. I have seen it, but I don't remember it; I know it because I know I signed that down there. Q. You signed the name of A. J. Lowary by W. S. Wishard, deputy county attorney, to that? A. Yes, sir. At that time I was deputy; that is, I was acting for him for accommodation. Q. I now hand reporter another written instrument and ask that it be identified as state's exhibit 'X.' I now hand the witness exhibit 'X' and ask you to examine that and state whether or not you ever saw that before? A. I don't remember of it; that is my name at the bottom, but it is not my writing. Q. You didn't sign that. A. No, sir. Q. Do you know who did? A. No, sir. Q. Were you deputy county attorney on that date, June 26, 1906? A. I suppose I was; if I didn't resign before the day was out. Q. Were you deputy county attorney when you signed that exhibit 'Z'? A. I certainly was, or I would not have filed it. Q. That appears to be filed on the 26th day of June, 1906. A. Yes, sir. Q. How many times did you resign? A. I resigned every time he went away and come back; I only acted in his absence for accommodation. Q. Did you hand in a written resignation? A. Yes, sir; every time. Q. And when he would go away he would appoint you again? A. He didn't appoint me regularly; there was only one or two regular appointments, and as soon as he would come back I would resign. Neither of the body of those complaints are in my handwriting. Q. I didn't ask you about that at all; I asked you about the signatures. I now hand you for examination defendant's exhibit 'C' and ask you to examine that; that appears to be in case No. 526, does it not? A. Yes, sir. Q. Exhibit 'Z', which I now hand you, which you stated you signed at the bottom, appears to be in case No. 526, does it not? A. Yes, sir. Q. What is exhibit 'Z' generally; what is that instrument? A. That is a complaint. Q. You caused that to be filed, did you? A. I didn't do anything with it; I suppose it was handed to me and I signed it; that is all. The state offered in evidence complaint marked exhibit 'Z', which is a complaint filed in the probate court of Blaine county, charging A. S. Rossiter with the crime of grand larceny, signed, A. J. Lowary, by W. S. Wishard, deputy county attorney, and endorsed upon the back: 'I have examined the facts in this case and recommend that a warrant do issue. A. J. Lowary, By W. S. Wishard, deputy county attorney.' Q. I

call your attention to the back of exhibit 'Z', where appears the signature of A. J. Lowary by W. S. Wishard, deputy county attorney, and ask you if you caused that to be placed there? A. Yes, sir; that is my writing. Q. Is it not a fact that in August, 1906, you and Pete Tyler were attempting and had made arrangements to obtain a deed to the John Rossiter and Jesse Rossiter farm in addition to the $200.00 which you had already received? A. No, sir; we made no attempt in no way, shape nor form; and I didn't know anything about them and had never been about John or Jesse Rossiter at that time. Q. Was that the transaction that occurred through the deeds; did you know that was to get bond? A. A. S. Rossiter gave a mortgage to secure his own bondsmen. Q. This deed that you state you and Evans and Tyler deeded over to Eliza Kelly, if you understand it, that was for the purpose of giving a bond for anybody? A. No, I didn't; I understood my part was to apear in the case as attorney. Q. I now hand you exhibit 'Y'; examine the signature attached and state whether or not that is your signature at the bottom. A. Yes, sir; that is my writing. Q. Did you write that letter or cause it to be written? A. I suppose I did; yes, sir. Q. Mr. Wishard, before that deed was made that is in question in this case from the Rossiter to Elwood Rossiter, didn't you know or expect that such a deed would be made in fact. A. I did not. Q. Didn't you expect that such a deed would be made from these parties to you and to Pete Tyler and to Joe Evans? A. I did not. Q. I now hand the stenographer a written instrument and ask that it be marked for identification as exhibit 'W'. I now hand you exhibit 'W' and ask you to examine that written instrument and especially the signature, and state whether or not you signed it. A. Yes, sir; that is my writing. Q. You wrote that letter? A. Yes, sir. But I had forgotten all about it."

Exhibit 'Y' is as follows:

"LAW OFFICE OF
W. S. WISHARD.

Watonga, Okla. August 21, 1906.

"Mr. A. S. Rossiter,

"Dear Sir:

"Your son was in today and consulted me in regard to matters concerning you which were started in the probate court of this place, and I have made a full investigation and have full knowledge of all matters connected therewith, and I can not

conceive any reason why you should remain away from your home in this county. There is nothing against you at this time. The bond that you gave was accepted and you have been discharged until the grand jury convenes, which will not be for some months, and as there is nothing against you that would cause you any uneasiness, I say to you as an attorney, being consulted by your son in your behalf, that you are perfectly safe to come home and remain as long as you see fit. You will not be disturbed nor have any trouble in the matter that caused you to leave. This I say as an attorney, and know whereof I am speaking, and hope to hear of your being at home within a very short time.                    Yours very respectfully,
                                    "W. S. Wishard."

STATE'S EXHIBIT "W."

"Law Office of
  W. S. Wishard.
                              Watonga, Okla., Aug. 26, 1906.
"P F. Tyler, Atty.,
        "Guthrie, O. T.
"Friend Pete:
   "The party, Young Rossiter, was in yesterday, also Perryman; and Rossiters are willing to give us the farm in addition to the two hundred that we have. The deeds are on the way from Jess & wife & John, but we will not make a single move until we get the farm. Perryman is helping all he can and is doing good work. I will know just as soon as the deeds arrive and will call you by phone, so we can close our deal with them. The old lady is the one making them come to time.
   "Everything is O. K. and all will end well I believe.
                                    "Yours truly,
                                    "W. S. Wishard."

On redirect examination he stated that he had forgotten all about that letter and did not sign the complaint marked exhibit "X" on the back, but did not know whose signature it is, and did not authorize any one to put his name there, and in putting his signature to exhibit "Z" was only a formal matter, simply O. K.'d by him as a matter of form.

Calvin Ford, as a witness for defendant, testified that in 1906 he was a justice of the peace in Arapahoe township, Blaine

county, territory of Oklahoma. That he first saw the alleged forged deed on August 31, 1906, at which time it was presented to him by Pete Tyler, and he acknowledged it as a justice of the peace, but did not see the parties sign the deed, as it was between daylight and dusk, and Pete told him to go ahead, that he was in a hurry. That Pete had three persons standing in a row, and that he told them to raise their right hands and he asked them, "Do each of you solemnly swear you do this of your own free will and accord"; that they didn't bow their heads, but they all said "Yes." That he then signed it and handed it to Pete Tyler.

Cross-examined, he said that he knew old man Rossiter and the boys for the past seventeen years, and that John Rossiter, Jesse Rossiter, and his wife Julia were not among the persons who appeared before him when the deed was acknowledged. That he knew the old man and these two sons were away, but that Elwood was at home; that at the time he thought Elwood Rossiter was about seventeen years old. That Pete Tyler paid him seventy-five cents for taking the acknowledgments, and then Tyler and Joe Evans jumped into their buggy and started towards town, and Elwood Rossiter and Gene Perryman pulled out under whip and lash after them.

J. R. Whisler, as a witness for defendant, was asked:

"Q. Do you know what the general reputation of both John and Jesse are in that community in which they live for truth and veracity? A. Well, I could not say as 1 do."

Perry Southwick, testifying, gave the same answer.

Anderson Chamlin, as a witness for the defendant, testified that he knew the general reputation of J. M. Rossiter and J. C. Rossiter for truth and veracity in the neighborhood in which they lived, and that it is bad.

William Howard's testimony was to the same effect. Cross-examined, he admitted that he had a law suit with them.

G. A. Moore testified that the Rossiter name was not very good.

F. H. Conklin testified for defendant that the reputation of John Rossiter for truth and veracity was bad.

E. H. Lookabaugh, as a witness for the defendant, testified that he was acquainted with John and Jesse Rossiter for about sixteen years, and their general reputation for truth and veracity was bad. Cross-examined, he admitted they were witnesses against him in a contest case, and that he was a brother of I. H. Lookabaugh.

Six exhibits were offered showing the handwriting of J. E. Evans, for comparison with the signature of Jesse Rossiter on the alleged forged deed. H. Brown, R. I. Temple, W. E. Piper, and S. J. Trout, as witnesses for the defendant, qualified as experts on handwriting, and after comparing the signature on the deed with the said exhibits, stated as their opinion that said signature was not in Evans' handwriting.

In rebuttal the state produced E. J. Warner, who testified that he was the clerk of the district court of Blaine county, and as such clerk was in possession of the records, files, and proceedings relating to criminal prosecutions. Handed defendant's exhibit "A", he was asked if the remainder of the files and court records in that case were in his possession. Answered: "Not all of them; there was one paper missing."

Thereupon the witness reads the journal as follows:

"And now upon motion defendant is by the court discharged and upon application of the county attorney it is by the court ordered that defendant be held under present bond to await action of the next grand jury."

Whereupon page 164 of the indictment record of the district court of Blaine county was read, which, omitting the caption and endorsement, is as follows:

"In the name and by the authority of the Territory of Oklahoma.

"Now comes A. J. Lowary, by W. S. Wishard, dept. county attorney, in and for the territory and county aforesaid, and gives the court to know and be informed that one Jesse Rossiter late of the county of Blaine and territory of Oklahoma, on the 7th

day of June in the year of our Lord one thousand nine hundred
and six at and within the said county and territory, did then and
there unlawfully, wilfully and feloniously commit the crime of
perjury, while upon his oath in the justice court before Albert
Ross, a justice of the peace in and for Liberty township in said
county, did testify in an action of replevin wherein A. S. Rossiter
was plaintiff and Frank Coleman was defendant for one set of
double harness of the value of $33.00, that the said Jesse Rossiter
then and there swore that said A. S. Rossiter bought said harness
in Cambridge, Ohio, and shipped same to Eagle City, O. T., and that
he helped to unbox said harness when in truth and in fact the
said Jess Rossiter well knew that said harness were not so bought
and shipped and that the same were the harness that belong to
said Frank Coleman, contrary to the form of the statutes. in such
cases made and provided and against the peace and dignity of
the territory of Oklahoma.

"A. J. LOWARY, County Attorney.
"By W. S. WISHARD, Dep.

"I have examined the facts in this case and recommend that
a warrant do issue.

"A. J. LOWARY, County Attorney.
"By W. S. WISHARD.

"Bail fixed at sum of $500.00."

That he had the original complaint as shown in the record
as exhibit "X," signed A. J. Lowary, by W. S. Wishard, deputy
county attorney, bearing the endorsement: "I have examined
the facts in this case and recommend that a warrant do issue. A.
J. Lowary, by W. S. Wishard, deputy county attorney. Filed June
5th, 1906." With the further record showing that in said case:
"We the grand jury hereby find no bill." Filed October 5th, 1906.

Whereupon the court admonished the jury not to consider the
evidence introduced by the state from the indictment record as
shown by the testimony of the clerk of the district court.

*Wm. O. Woolman,* for plaintiff in error.

*Chas. West.* Atty. Gen., and *Smith C. Matson,* Asst. Atty.
Gen., for the State.

DOYLE, JUDGE. (after stating the facts as above). The first
question presented for our consideration relates to the sufficiency

of the indictment. It is insisted that the trial court erred in overruling the demurrer. In support of this contention it is argued that:

.. "If the state in this case would justify the form of indictment, it can do only by taking one of two positions: First, that it follows the language of the statute; or, second, that it follows the common law form. That said indictment is not direct and certain as regards the offense charged and the venue thereof, and is defective in that does not specify in what the forgery consists, sufficient to charge the defendant and give notice of the nature of the crime he is to defend against. That it does not allege the property purported to be conveyed is in existence. That it does not allege that the Rossiters had title thereto or what interest they had in the land purported to be conveyed."

It is also contended that:

"There is a fatal contradiction in the allegations of the indictment, in that the allegation is that the instrument purports to be the act of other persons, to wit: 'one John Rossiter, one J. C. Rossiter and one Julia Rossiter, when the copy of said instrument following shows that it purports to be the act of J. M. Rossiter, Julia Rossiter, and J. C. Rossiter. And that the same defect arises in charging who was intended to be defrauded, wherein it says: · 'To then and there cheat and defraud the said John Rossiter, and said J. C. Rossiter and the said Julia Rossiter.' And that in said indictment the words, 'diminished' and 'bound', are used to show the effect that the purported forgery had upon the property of the Rossiters, none of which words are to be found in·the statute defining forgery in the first degree."

· "Forgery was a misdemeanor at the common law. From the earliest times in the history of the criminal law of England statutes have been passed upon the subject. As early as 1413 a statute ·(1 Hen. v., ch. 3) was enacted which recited that many persons had been deprived of their property by false deeds, wherefore it was enacted 'that the party so grieved shall have his suit in that case, and recover his damages; and the party convict shall make fine and ransom at the King's pleasure.' Again, the English statute of 5 Eliz., ch. 14, sec. 2) prohibited the making or forging of any false deed, etc., to the intent that the state of freehold or inheritance of any person in lands, etc., shall not be molested, troubled, defeated, recovered, or changed; 'and the third section

fixes a penalty for any person to forge or make any false charter, deed or writing, to the intent that any person shall have or claim any estate or interest for term of years of, in or to any lands. The forgery of deeds was made felony, without benefit of clergy, by 2 Geo. II., chapter 25. The precedents framed under the English statutes, and especially those under the second section of (Eliz., ch. 14) on account of the particular phraseology of the enactments, uniformly set out the title of the party whose estate in the land was intended to be molested.' (2 Starkie, Crim. Law, 481; 3 Chit. Crim. Law, 1062.) 'Legislation in England has in recent times rendered unnecessary the mention of the name of the person to be defrauded, permitting simply a general allegation of fraudulent intent.' 24 and 25 Vict. c. 98; 2 Bishop's New Crim. Proc., par. 425b."

Testing this indictment by the rules of the common law, which prescribes the averments necessary to be made in an indictment for forgery, it would probably be sufficient. The indictment charges a violation of section 2560, Snyder's Sts., providing that:

"Every person who, with intent to defraud, forges, counterfeits, or falsely alters: 1st, Any will or codicil of real or personal property, or any deed or other instrument being or purporting to be the act of another, by which any right or interest in real property is or purports to be transferred, conveyed or in any way changed or affected; * * * is guilty of forgery in the first degree."

Under the statute, there are three essential elements in the offense here charged: First, a deed apparently valid; second, a fraudulent intent on the part of the accused; and third, that the signatures thereto were forged. We have carefully analyzed the indictment, and while it must be conceded that it is subject to criticism for redundancy, prolixity, unnecessary particularization, and superfluous terms, our conclusion is that the numerous objections thereto are not well taken. The indictment charges every essential element of the offense of forgery in the first degree as defined by the statute, and is otherwise sufficient.

Technical objections as to defect in matter of form only, and not relating to the substantial requirements of an indictment, which do not tend to the prejudice of the substantial rights of the

defendant upon the merits, cannot avail under the provisions of our criminal code.

Section 6697, Snyder's Sts., provides:

"The indictment must be direct and certain as it regards: 1. The party charged. 2. The offense charged. 3. The particular circumstances of the offense charged, when they are necessary to constitute a complete offense."

Section 6701, Snyder's Sts., provides:

"When an offense involves the commission of, or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured, or intended to be injured, is not material."

Section 6705, Snyder's Sts., provides:

"No indictment is insufficient, nor can the trial, judgment, or other proceedings thereon be affected, by reason of a defect or imperfection in the matter of form which does not tend to the prejudice of the substantial rights of the defendant upon the merits."

Section 6706, Snyder's Sts., provides:

"Neither presumption of law, nor matters of which judicial notice is taken, need be stated in an indictment."

The objections made are purely technical. Counsel does not attempt to show the court that defendant was in any respect mislead as to the transaction he was called upon to defend against. Can it be said that there is any ambiguity in this indictment that could mislead the jury or leave the defendant doubtful as to the true import of the charge?

The jurisdiction of the offense in Blaine county is sufficiently alleged. The omission of the word "territory", in alleging the place where the crime was committed, could not deprive the defendant of any substantial right. All reference made in the indictment prior to the one complained of refers to the state of Oklahoma. The state was the successor of the territory with reference to this particular offense, and jurisdiction was conferred on the district court of Blaine county, state of Oklahoma, to hear and determine all prosecutions as to offenses committed with-

in the boundaries of that county prior to statehood. Proof that the offense was committed within Blaine county, Oklahoma Territory, now comprising Blaine county, state of Oklahoma, would not be a variance from the allegation of the indictment. While this indictment is in the name of the state, it alleges that the acts complained of were "contrary to the form of the statute in such cases made and provided," and this means against the statute in force at the time the offense was committed, and continued in force by the Enabling Act and the Constitution. *Faggard v. State,* 3 Okla. Cr. 166.

The object of setting out the forged instrument in the indictment is twofold: First, to enable the court to determine from its tenor whether or not it is a proper subject of forgery; second, to advise the defendant of the precise offense charged, and of the particular instrument upon which the charge is founded. The slight variance in the names alleged was immaterial, provided that defendant was not mislead thereby. In this instance, he could not have been mislead, because the alleged forged deed is set out in full, and the identity of the parties therein named is unquestioned.

The courts of Oklahoma take judicial notice of governmental surveys and subdivisions of land thereunder, and will take judicial knowledge of the fact that the land described in the indictment is in existence. It was therefore unnecessary to allege this fact. It was also unnecessary to allege title thereto. The land which the alleged deed purported to convey has an actual potential existence, definitely described and located. The alleged deed on its face purports to transfer the title to said land, and was complete in itself for that purpose. It did not require the allegation of extrinsic facts to render its deception complete, and it was duly filed for public record in the office of the register of deeds of Blaine county. The right or interest in the property purported to be transferred, conveyed, or in any way changed or affected, is a mere matter of evidence bearing upon the intent to defraud.

It is apparent that fraud by means of a false or forged deed may be perpetrated not only upon the owner of the land, but upon strangers to the title who may be induced to rely upon the genuineness of the forged deed to advance money for the purchase or loan money upon the faith of the apparent legal validity of such instrument.

Mr. Bishop says:

"The intent to defraud any number of victims may be laid in one count, which will not thereby be rendered double, and the allegation will be sustained by proof of it as to any one of them." (2 Bish. New Cr. Proc., par. 425a.)

"The intent is presumed, to defraud the person whose name is forged, without the testimony of witnesses, from the forgery itself. So is the intent to defraud the one to whom the defendant, with knowledge of the forgery, passed or offered the forged instrument for value. In aid of this presumption, or as applicable in cases affording no scope for it, other proofs may be adduced." (2 Bish. New Cr. Proc., par. 427a.)

"It is the essence of forgery that it should be with fraudulent intention. It has also been shown that such intention is to be inferred from facts; and that scienter may be shown by other forgeries and fraudulent utterings. A general intent to defraud is enough. It is not necessary that it should appear that the intent was pointed at any particular person." (Wharton's Cr. L. [10th Ed.] sec. 717.)

We are inclined to think that where the instrument alleged to have been forged is a deed containing a description conforming to a governmental survey and subdivision, and appears to be complete on its face, by which any right or interest in said described real property is or purports to be transferred, conveyed, or in any way changed or affected, all that would be necessary to allege is that the forgery was done with intent to defraud. Where, however, as in this case, the names of the persons intended to be defrauded are alleged in the indictment in stating the intent to defraud, it is sufficient to describe the persons intended to be defrauded with reasonable certainty; but it is unnecessary to allege

what interest, if any, they had in the land purported to be conveyed.

Error is assigned upon the action of the court in overruling the motion, made by the defendant at the close of the state's evidence, to advise the jury to acquit. Under this assignment it is contended that the evidence offered was insufficient to prove that this defendant was concerned with the commission of the offense charged, and that there is a fatal variance between the allegations in the indictment and the evidence. What we have heretofore said in this opinion in considering the sufficiency of the indictment is equally applicable to the proof on the question of variance. The sufficiency of the evidence showing the commission of the crime and the guilt of the defendant is not a question for the court, if there is any evidence showing these facts. In this case the conclusiveness of the facts and circumstances, as shown by the evidence, corroborated by the admissions of the defendant, as testified to by witnesses for the state, was not for the court to determine. It is the exclusive province of the jury to weigh the evidence and determine the facts. The motion to direct a verdict of acquittal was properly overruled by the court.

It is contended that the court erred in giving to the jury instructions numbered 2, 4, 5, and 6, respectively. No authorities are cited in support of this assignment. Said instructions are as follows:

"2. All persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, may be indicted, tried and punished as principals."

"4. It is not necessary, to constitute the offense of forgery of a deed to land, that the person or persons charged with such offense intended to defraud or injure any particular person, or that any particular person ws injured or defrauded by the forgery, but it will be sufficient to constitute the offense if it is established that the accused, or that he and others acting with him, and aiding and abetting in the commission of the offense, with intent to defraud, signed the name or names to such deed of the person or persons who purport to be the makers thereof, and that the

name or names were signed without authority from such person or persons so to do, and it further appears that the deed, if true and genuine, would have the effect to transfer, convey or otherwise affect the interest of the person or persons whose act it purports to be, in the land described in such deed. Nor is it essential that the purported makers of the deed, in fact, had any interest in the land described therein, but it must appear that the land described did exist at the time of the alleged forgery."

"5. Bearing in mind the foregoing definitions and carefully applying these instructions to the evidence, if you believe beyond a reasonable doubt, that on or about the 31st day of August, 1906, in this, Blaine county, then in the territory of Oklahoma, J. C. Evans and P. F. Tyler, or J. C. Evans and P. F. Tyler and others, acting together and aiding and abetting each other, and with intent to defraud J. C. Rossiter, J. M. Rossiter, and Julia Rossiter, did write and sign, or with such intent to defraud, did procure or cause to be written and signed the name of J. C. Rossiter, J. M. Rossiter, or Julia Rossiter to the instrument set out and described in the indictment, and further find that said instrument was so signed without authority so to do; then the said J. C. Evans and P. F. Tyler are guilty of forgery of said instrument, and the offense will be forgery in the first degree; and if you so find and further believe beyond a reasonable doubt that the defendant, W. S. Wishard, knowing an intent of the said Evans and Tyler to defraud, induced or encouraged them to commit such offense, or to procure the commission thereof, then you should find him, the said W. S. Wishard, guilty of said offense of forgery in the first degree and so say by your verdict. If you do not so believe. you must acquit the defendant and say by your verdict 'not guilty.'"

"6. You are instructed that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense; nor, can one accomplice corroborate another. An accomplice, as the word is here used, means any one connected with the crime committed, either as principal offender, as an. accomplice, as an accessory, or otherwise. It includes all persons who are connected with the crime by unlawful act or omission on their part transpiring either before or at the time of the commission of the offense and whether or not he or she was

present and participated in the commission thereof. And if you find that the deed set out in the indictment was forged and that any witness who has testified herein against the defendant was or is an accomplice, as above defined, then you must disregard the testimony of such witness in so far as the same is against the defendant, unless corroborated as above stated."

There was no request for other instructions on the part of the defendant.

While instruction No. 4, considered by itself, is too general, it is properly limited by instruction No. 5. It is the duty of the jury to consider all the instructions together, and if when so considered they fairly state the law, this is sufficient. A cause should not be reversed because some one of the instructions may state the law without sufficient qualification. The principle that an instruction, which is general in its character, may be limited or qualified by other instructions given, does not contravene the rule that "material error in one instruction calculated to mislead is not cured by a subsequent contradictory instruction." We believe the instructions given, considered as a whole, fairly and fully state the law applicable under the evidence in the case.

It is also contended that: "The verdict and judgment is contrary to the evidence and contrary to the law." In support of this assignment it is argued that:'

"The defendant Wishard had nothing to do with the getting of the deed from J. M., J. C., and Julia Rossiter to Elwood Rossiter; that he was not present at any of these transactions; that his letter to Pete Tyler clearly shows that he was expecting *bona fide* deeds to the land; and that there is absolutely no competent evidence connecting Wishard with the forgery of the deed on August 31, 1906."

The theory of the prosecution was that Wishard, Tyler, and Evans conspired together to defraud the Rossiters. The testimony shows that this defendant, as deputy county attorney, approved and filed several complaints against members of the Rossiter family. The complaints were all based upon the proceedings had in connection with a civil suit concerning the ownership

of a set of harness. In one of these cases Tyler secured two hundred dollars as an attorney fee and gave one-half of it to this defendant. The letter of this defendant to Tyler shows that it was their common purpose and design to defraud the Rossiters out of the land described in the alleged forged deed. His admissions upon the witness stand are sufficient, in connection with his letter to his codefendant Tyler, to sustain the verdict.

Section 2045, Snyder's Sts., provides:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they direcetly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

A conspiracy may be defined generally as a combination of two or more persons by some concerned action to accomplish some criminal or unlawful purpose or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means. Mr. Greenleaf says:

"The connection of the individuals in the unlawful enterprise being thus shown, every act and declaration of each member of the confederacy, in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all; and is therefore original evidence against each of them. It makes no difference at what time any one entered into the conspiracy. Every one who does enter into a common purpose or design is generally deemed, in law, a party to every act which had before been done by the others and a party to every act which may afterwards be done by any of the others in furtherance of such common design." (Greenleaf on Ev., sec. 111.)

"In cases of crimes perpetrated by several persons, when once the conspiracy or combination is established, the act or declaration of one conspirator, or accomplice, in the prosecution of the enterprise, is considered the act or declaration of all, and therefore imputable to all. All are deemed to assent to, or command, what is said or done by any one in furtherance of the common object. A foundation, however, must first be laid *aliunde*, by proof sufficient, in the opinion of the court, to establish *prima facie* the fact of conspiracy between the parties; the question

of such conspiracy being ultimately for the jury." (Wharton's Cr. Ev. (9th Ed.) 698.)

It is an undisputed fact that the signatures to the alleged deed were forged. We think the evidence is conclusive; that this defendant was an accessory before the fact. Our statute abolishes the distinction between accessories before the fact and principals. By it all accessories before the fact are made principals. As the acts of the principal are thus made the acts of the accessory, the latter may be charged with having done the act himself. We believe the evidence clearly shows that it was the common purpose and design of the defendants to defraud the Rossiters by securing for themselves the land described in the alleged forged deed. It would be immaterial whether or not their original purpose and design may have been to secure said land by fraudulent means other than the alleged forgery.

As a general rule, in cases of conspiracy, each conspirator is criminally responsible for the acts of his confederates committed in furtherance or in prosecution of the common design, or for any act which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original purpose or design. Whether the evidence tending to prove the unlawful purpose of conspiracy is sufficient and that the forgery alleged was in furtherance of the common purpose and design, were questions for the jury to determine. On the other hand every person entering into a conspiracy or common design already formed is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design. It is a conceded fact that this defendant was present the morning following the day of the forgery and with his codefendants executed and delivered their deed to the land described in the indictment. In explanation of this, the defendant testifies that the deed was executed for the purpose of securing to him an attorney fee to defend the Rossiters. As a matter of fact, he as

5. Cr.—41.

deputy county attorney had represented the state in filing the criminal complaints, and was therefore disqualified to act as attorney for the Rossiters.

As a general rule, where there is evidence of a conspiracy to commit a crime, and of its subsequent commission, the state may, in support and corroboration thereof, show any act of the original conspirators intermediate the conspiracy and the crime which apparently recognizes the existence of the conspiracy, and reasonably indicates preparation to commit the crime, or preserve its fruits, and this notwithstanding such special act or preparation was not the one discussed or agreed upon by the conspirators.

Without going further into the testimony, we are clearly of the opinion that the verdict of the jury is abundantly sustained by the evidence.

The record contains the following recital:

"Now on this 9th day of October, 1909, jury returned into open court, all parties being present.

"Thereupon the court inquired of the jury if they had arrived at a verdict.

"Whereupon, one of their number stated, 'We disagree in finding the cause of this forgery.'

"Whereupon, the court informed them that if they had not agreed they could return to their jury room for further deliberation, and also stated to said jury that 'If they could not agree they had all of the next week in which to deliberate.'"

There was no exception taken to the statement of the court at the time it was made, but the statement was assigned as one of the grounds in the motion for a new trial. It is now insisted that the court sought to coerce a verdict. Evidently from the failure to take an exception, the claim of coercion is an afterthought. The length of time during which a jury should be required to consider a case is within the sound discretion of the trial court, and this court will not interfere with the exercise thereof unless manifestly abused. It is impossible to state any rule by which to determine what language by the court is sufficiently coercive to invalidate a verdict. This depends upon the circumstances of

each case. We do not think that the statement of the court was calculated to prejudice the rights of the defendant. No court would, by mere physical exhaustion, force a verdict when satisfied that failure to agree resulted from conscientious difference of judgment as to the weight of the evidence. It is the duty of the court to detain the jury until satisfied that failure to agree springs from that cause, and that alone. It must then be left to the sound discretion of the trial judge to determine how long the jury shall be detained, and what, if anything, shall be said as to the probable length of the detention. Unless this judicial discretion is abused, the verdict should stand.

There being no error in the record prejudicial to the substantial rights of the defendant, the judgment of the district court of Blaine county is hereby affirmed.

FURMAN, Presiding Judge, and ARMSTRONG, Judge, concur.