# EARL EVERIDGE v. STATE.

No. A-2981.    Opinion Filed June 24, 1920.

(190 Pac. 701.)

(Syllabus.)

1.    **APPEAL AND ERROR—Harmless Error—Admission of Evidence.** In a prosecution for murder committed for the purpose of robbery, held, the error, if any, in admitting evidence of statements made by a coconspirator and codefendant the night after the robbery, the defendant not being present at the time, was harmless, where the other evidence in the case showed beyond doubt that defendant participated in perpetrating the robbery and in committing the murder.

2.    **HOMICIDE—Murder—Sufficiency of Evidence.** In a prosecution for murder, defendant having been convicted with imprisonment for life as the punishment, the evidence reviewed and defendant held justly convicted.

*Appeal from District Court, Choctaw County;*
*C. E. Dudley, Judge.*

Earl Everidge was convicted of murder, and he appeals. Affirmed.

Plaintiff in error, Earl Everidge, and Edward Hembree and Floyd Aikens were charged jointly with the murder of P. H. Hearn, alleged to have been committed in Pushmataha county on the 16th day of September, 1915. A severance was granted; then upon the application of plaintiff in error, hereinafter referred to as the defendant, change of venue was granted and the case transferred to Choctaw county, where upon his trial the defendant was found guilty of murder and his punishment fixed at imprisonment for life. From the judgment rendered on the verdict he prosecutes this appeal.

The evidence shows that P. H. Hearn, the deceased, was an operator at the depot of the Frisco Railroad at Antlers, and on the morning of September 16, 1915, shortly after 3 o'clock he was found by the conductor of an arriving train lying on a baggage truck at the station "bloody all over, his hair all matted, and his face battered up." He was unconscious and remained unconscious until he died on the 23d day of September, 1915.

Dr. W. W. Christian testified that he had practiced his profession 20 years, and was connected with the Paris, Texas, sanitarium, and went to Antlers after the deceased was injured to see him; that upon examination it was determined to remove him, and he was removed on the day he was injured, to said sanitarium, where, on the 23d day of September, 1915, at 2:30 he died; and that his death was caused by blows from a blunt instrument, which fractured his skull.

L. L. Ray testified that he was station agent of the Frisco Railroad at Antlers when the deceased was killed; that at about 3:20 a. m. of the morning of said killing he was called by phone and went immediately to said depot and there saw Mr. Hearn lying on a table in the office in an unconscious condition; that he examined the cash drawer and found therein only 21 pennies; and that on the night of the homicide Mr. Brewner, another operator, was relieved by Mr. Hearn, to whom, as shown by the record in the handwriting of Mr. Brewner, which handwriting he identified, Brewner turned over $18.36, which was in silver dollars, half dollars, quarters, dimes, and pennies.

Jeff Sharp testified that he was phoned to come to the depot and upon his arrival called the sheriff, who came, and he and the sheriff made an investigation and did not

find anything; that at about daylight he returned to the depot and made an examination, and found about 95 yards from the depot a hat and a piece of a gun; that the hat and piece of gun now exhibited to him was the hat and piece of gun he found; that he also found in a little grove near where the hat and piece of gun were found where two horses and a mule had been hitched, and that he tracked them out to the main street and then back to where they went and came.

George Alexander testified that he knew the defendant and remembered the robbery of the depot at Antlers and the killing of the deceased in September, 1915; that on the night preceding the killing he saw the defendant a little after dark at Mrs. Piercy's, in Farris, from whom he borrowed a pistol, and that at the time he noticed the hat that the defendant had on, a brown hat; that the next day he saw the defendant again at Mrs. Piercy's, the morning after the homicide, when he returned the pistol which he had borrowed and asked for some coffee, and at the time he looked like a man who had been on a big drunk, appeared to be nervous and looked like a man that had lost sleep; that he was acquainted with Edward Hembree, commonly called "Chock" Hembree, and with Floyd Aikens; that the night after the killing of the deceased he saw Floyd Aikens.

The witness was then asked if at the time he had any conversation with Floyd Aikens, to which question the defendant objected, the court overruled the objection, and the defendant excepted. The witness answered: That at the time named Floyd Aikens told witness that he (Aikens) and the defendant "done the robbing and killing there at Antlers; that he and defendant rode their respective horses

and that Hembree rode old man Piercy's damned old mule; that he had that damned old pistol of Chock Hembree, the defendant had old lady Piercy's pistol, and Chock had Jim Jones' shotgun, which did the work; that they went down there and hitched their horses in the little grove and waited until the train ran, and then went in and done the work; that the damned old man knew Earl and he stayed where he could not be seen, and he (Aikens) and Chock went in and put their guns on this fellow through the window and told him to hold his hands up"; that Earl came in and got the money, and that he had not seen him since and did not know how much he got; that the defendant told them to kill the deceased, and they took him off to the south end of the depot and across the railroad; that he did not know that Chock was going to hit the deceased, and that when Chock hit him the first lick deceased fell on his knees and Chock hit him again; that he (Aikens) told Chock not to hit him again, that he had already killed him, and that they got on their horses and rode out of town and overtook the defendant, who rode off and left them; "that Earl got every damned bit of the money, and if the son of a bitch didn't divvy up they were going to kill him;" that he did not see the defendant either at or about Farris in his usual haunts, Thursday, Friday, or Saturday after the robbery of the depot, that he had any recollection of.

"Thereupon the defendant asked the court 'to instruct the jury to wholly disregard that portion of the testimony of the witness George Alexander wherein he relates the conversation between himself and Floyd Aikens, wherein Floyd Aikens makes the statement to him as to the robbery and as to his participation in the robbery, for the reason that said statement was made in the absence of the defendant, Earl Everidge, is wholly hearsay, and for that reason is incompetent, irrelevant, and immaterial.'"

The court overruled the motion to strike, and the defendant excepted.

Jim Jones testified that in September, 1915, he lived at Farris, Okla.; that he was acquainted with Edward Hembree, commonly known as "Chock" Hembree; that he heard about the killing of Mr. Hearn; that the night before the homicide he loaned his single 12-gauge shotgun to Hembree for the purpose, as stated at the time by Hembree, for Earl Everidge to kill a dog with; that the next time he saw Hembree was the Saturday after the said homicide, when he asked him where his gun was, and Hembree replied at Earl Everidge's, and that he went up there to see about it, to get it, but did not succeed; that the gun now exhibited to him was the gun he loaned Hembree, but it was in a different condition when so loaned; that at that time the stock was not "busted." The defendant asked the court to instruct the jury not to consider the evidence of Jones in regard to the loan of the gun, which the court refused to do, and the defendant excepted.

Joe Whiteside testified that in September, 1915, he was living at Farris; that he was acquainted with the defendant; that he remembered hearing about the robbery of the Frisco depot and the killing of Mr. Hearn on the morning of September 16, 1915; that he saw the defendant that morning; that he came to witness' home on horseback; that he was bareheaded, and he thought had his hat tied on his saddle; that the defendant came for the purpose of seeing if witness was going to Atoka; that defendant returned to his home, to which witness afterwards went, and when he got there defendant was changing his clothes, and witness saw on defendant's dresser some silver dollars, quarters, nickels, and dimes, and some pennies; that witness and de-

fendant went to Atoka together, and on the way the defendant said he had about $18; that the defendant did not say anything to witness about where he and his horse had been the night before; that from Atoka witness went to West Lehigh, and defendant said he was going to McAlester to see a girl; that the witness had been around with the defendant and that he did not know that he had ever seen him broke; that he had seen him with money lots of times; that it was not unusual for the defendant to ride around with his hat or cap tied to his saddle.

Joe Whiteside, recalled, testified that he was at Mrs. Knox's on the night of the 15th with the defendant and members of the Knox family; that the defendant stayed about an hour; that some one rode up to the gate and hollered, "Is Earl in there?" and defendant went out and returned, and went out again and did not return; that when going to Atoka he asked the defendant who it was that called him out and he said it was Chock or Aikens, one; that it was about 8 o'clock when some one came to the gate and asked for Earl, and that it was 15 or 17 miles from Farris to Antlers.

Mrs. Velva Smith testified that she was married, but that she was not married in September, 1915; that she lived in McAlester and was acquainted with the defendant, who paid attention to her, and that on a Friday in September, 1915, she saw him at the home of her aunt in McAlester; that in their conversation he said that a few nights before he was in Antlers on Tuesday and on Wednesday night, and that he saw a man killed, whose name she understood to be "Herring," and that he was standing within ten feet of the man when he was killed. This witness further testified that at the time of his visit he looked like, and said, he had

lost a great deal of sleep; that a little fair was going on at the time and the defendant had a little change in his hand and said he had enough to go to the fair on; that before said visit she had been often with the defendant, but had not then seen him for several weeks. Hereupon the witness admitted that at the dictation of her husband she had written Defendant's Exhibit E, which was admitted in evidence and is as follows:

"Wichita Falls, Texas, July 12, 1916.

"Moman Pruiett, Atty., Oklahoma City, Okl.—Dear Sir:   My wife, Mrs. Velva Smith, formerly Miss Velvet Torbett, is under bond to appear before the district court at Hugo, on October 2, as a witness in the Earl Everidge murder case, and will appear there unless terms can be made satisfactory between you and I so it will pay me to do otherwise. I would like your advice on this matter either through the mail or by a private talk as soon as possible, that we can make our plans accordingly. Hoping that you will give this matter immediate attention, I remain,

"Yours truly,                              N. H. Smith.

"Address: N. H. Smith, 305 Lee Street, Wichita Falls."

Mrs. Mary A. Piercy testified that in September, 1915, she lived in Farris; that she was acquainted with the defendant, and saw him on the night of September 15, 1915, at which time she loaned him her six-shooter for the purpose, as stated by him at the time, to protect his mother's smokehouse; that the next time she saw him was at her home in Farris the next morning, when he returned her pistol and wanted a cup of coffee, which she gave him; that at the time he looked like some one who had been staying up all night; that she heard of the killing of deceased the day after it occurred, which was the same day

that the defendant returned her pistol; that old man Piercy had a mule which she kept right there all the time; that she had loaned the gun to the defendant at different times.

Rufus O'Quinn testified that in 1915 he lived in Farris, Okla.; that he now resided in Tennessee, having left Farris in December of last year; that he knows and has known the defendant four or five years; that he knows Edward Hembree and Floyd Aikens; that he had known Hembree about five, and Aikens about three, years; that last year he was engaged in farming and working in the telephone office in Farris; that on a Tuesday night preceding the killing of the deceased he went out with Floyd Aikens, Chock Hembree, and the defendant, on horseback, he riding Piercy's mule and the others riding horses; that they road to Darwin Church, which is six miles out of Farris and 11 miles west of Antlers, arriving there about 9:30 or 10 o'clock, and found the church not lighted, and they went on down the road in the direction of Antlers and stopped at a cane mill about a mile from Darwin and about one-half of a mile off the road to Antlers, drank some cane juice, remained about 15 or 20 minutes, and left, going on about 2 miles and stopped, talked, and smoked and then went on in the direction of Antlers, and stopped at Uncle Dick Lock's fence, about three-quarters of a mile from Antlers, talked and smoked; it was suggested that they go into Antlers to get some tobacco, and the defendant, Aikens, and witness went to Antlers, to the street crossing, and then to the depot; that at the depot they saw the depot agent in his office and the other fellow was on the platform; they stopped about 10 feet from the depot, and Floyd Aikens and the defendant said they had come to rob the depot, and witness said he was not going to have anything to do with it, and advised them to put it off because they did not have sufficient arms, and they

said they would study about it, and finally agreed to put it off; that while they were in Antlers and about 3 o'clock a. m. a train passed, and they remained there about 15 minutes; that the defendant then said he would "put it off if we would agree to come back the next night," to which Aikens agreed, and witness told them he would not have anything to do with it, and they said he (witness) was a "feather leg if I would not come back"; that they would come back any way; that they then returned to the horses and Chock Hembree, and the defendant remarked, "We got what we went for," and Aikens said, "No; we were just lying;" and they got on their horses and rode in the direction of Farris; that the next time he saw the defendant was at the phone office in Farris on the 15th of September, 1915; that Hembree and Aikens were present and asked witness if he was going back with them that night, to which he answered No, and they remarked they would go back and did not need him (the defendant objected to this evidence and moved to exclude the same, the court refused to exclude said evidence, and the defendant excepted) ; that the morning after the night of the homicide he saw Chock Hembree at the phone office in Farris, and he (Hembree) told him that they had robbed the depot and killed the agent; that they had hit him three times with a shotgun and punched him once (the defendant objected to the introduction of said evidence, the court overruled the objection, and the defendant excepted).

O'Quinn further testified that Hembree said that the defendant had the money and had run off with it; that about one hour after said conversation he had a second conversation with Chock Hembree in which Chock asked him "if he suspected anything by the mule being out," to which witness replied Yes, and Chock then said that he rode the mule to town, and when he brought him back

that he just turned him out and did not feed him; that the said mule was the same mule that witness had ridden the night before in company with the defendant at Antlers; that the same evening he had a conversation with Aikens, who told him to watch the mailman, to see what he had to say about it; that he had seen the gun which was in evidence; that he had hunted with it, and knew it and that it belonged to Jim Jones; that afterwards Chock asked him if he did not want to see the gun, and witness replied Yes, and Chock, at Bill Hembree's place, about one-half of a mile from Farris, showed him the gun and "the stock was busted, the breach off, and the barrel bent"; that, being shown the gun, Chock unbreached it and threw the parts about ten feet apart, and they returned to Farris; that he did not have any conversation with the defendant after the crime was committed in regard to it, and that at the time he had the conversations with Chock Hembree and Floyd Aikens in regard to said, homicide the defendant was not present. The defendant objected to the introduction of said statements made to O'Quinn in the absence of the defendant, and also requested the court to withdraw said testimony from the jury. The court overruled said objection, and refused to withdraw said evidence from the jury, and the defendant excepted.

Wiley Smith testified that he heard of the robbery of the depot and the killing of Mr. Hearn the day after the tragedy; that on the Wednesday before the tragedy he met Chock Hembree, Floyd Aikens, and Ruff O'Quinn in the early morning, going in the direction of Farris, and the defendant about three miles from where he met the others, who was on horseback going in the direction of Farris.

Dell Wilson testified that he was sheriff of Pushma-taha county; that he knew and had known the defendant six or seven years and that he had known the deceased about two years; that when he first heard of Mr. Hearn's death in Antlers he went to the depot and found the deceased lying on the table in the Frisco office unconscious, with several wounds around his head; that he made an examination and found, something like sunup, and about four telegraph poles from the depot, some blood, a piece of a gun, and some tracks where some horses had been hitched off the right of way about 30 or 40 yards from where he found the piece of the gun, which was the same piece as now exhibited to him; that he found the tracks of two horses and a mule, one of which was bare-footed, the other had three shoes, and the mule was shod in front; that he followed the tracks from Antlers toward Farris as far as he could; that one of the horses went direct west and the other horse went north—went a mile west and turned north; that the defendant's home was on the road from Joe Whiteside's to Farris, and the direction the lone horse was traveling he would pass Joe Whiteside's in going down to Farris; that the first time after the said homicide that he saw Hembree and Aikens was about September 20; that he received a few days after the arrest of said defendants, at Amos Hembree's, an uncle of Chock, in the Farris neighborhood, a part of a gun, and identified the part of said gun now exhibited to him as the same that had been delivered to him; that after he arrested the defendant he had a conversation with him as to his whereabouts on Tuesday night preceding the killing on Wednesday night. The defendant objected to the introduction of such conversation in evidence, the court overruled said objection, and the defendant excepted. The

defendant, in reply to said question by the sheriff, said that on Tuesday night he came out to the sorghum mill, out east of Darwin a mile or so, with Rufus O'Quinn, Floyd Aikens, and Chock Hembree, and drank some sorghum juice, and his horse got loose and he did not get home until up in the day Wednesday; that he asked him where he was Wednesday night, and he said in Farris at Mr. Knox's and that he went home about 11:30, and that he borrowed a pistol from Mrs. Piercy because some one had been breaking into his smokehouse and he thought he would get him, and that he (defendant) went to bed Wednesday night about 11:30, got up next morning real early, and went to old lady Piercy's and got his breakfast, and the next morning he went to Atoka with Joe Whiteside, and from there to McAlester and from McAlester back to Atoka.

This witness further testified that the horse which he tracked on the north road was shod with two shoes on the front and one on the hind feet, and that the shoes on said horse were pretty near as wide across one way as another, and that you hardly ever see a horse's feet shaped that way, and would make a track you could tell from any other horse track; that a few days after the arrest of the defendant he (witness) noticed that the feet of the defendant's horse corresponded to the track that he had tracked, but that at the time he examined the feet of the defendant's horse the horse had been shod all around, and defendant said he had had him shod behind at Atoka; that he did not measure the tracks or the hoof of the defendant's horse, and that he tracked said horse about nine miles from Antlers and lost it.

Joe Whiteside, recalled, testified that on Tuesday morning after the homicide Wednesday night the defendant told him that he (defendant) spent Wednesday night at Pat Taylor's and played poker with Pat Taylor and George Blaine, but did not say where he played poker.

The defendant moved the court to direct a verdict of not guilty, which said motion for a directed verdict was denied, and the defendant excepted.

### For the Defense.

A. L. Johnson testified that he resided at, and was the postmaster of, Farris, Okla.; knew the defendant since 1911 and his general reputation in the community in which he lived as being a law-abiding citizen, and that it was good; that he remembered the incident in which the depot agent at Antlers was killed; and that before said homicide, but how long he was unable to say, he changed a $20 bill for the defendant.

Several other persons also testified to the previous good character of the defendant as a law-abiding citizen, and thereupon the state announced that it did not make any issue of the good reputation of this defendant up to the time of the killing.

Edgar Everidge testified that he was a brother of the defendant and 22 years old in November; that he remembered the killing of Pat Hearn, the depot agent; that on Monday, prior to the killing of Mr. Hearn, he was present and saw Mr. Johnson change a $20 bill for the defendant, giving him silver in change, and, while he did not know, he thought he also gave him some pennies.

Ethel Brown testified that she remembered about hearing of the death of the depot agent at Antlers, Okla.,

on September 16, 1915, at which time she was living at Farris, just west across the street from the phone office; that on the morning after the agent was killed she saw Rufus O'Quinn at Mrs. Piercy's between 6 and 7 o'clock, making up bread and had dough all over his hands; that she went over there to get water, and O'Quinn asked her to have a drink of beer, for which she thanked him and declined; that she did not see the defendant there; that the evening before she had seen Edward Hembree and the defendant over at Mrs. Piercy's.

*Moman Pruiett, S. E. Welch,* and *Baxter Taylor,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

ARMSTRONG, J. (after stating the facts as above). The only errors relied on in defendant's brief for a reversal of the judgment are the following:

(1) The admission, against the objection of the defendant, of the testimony of O'Quinn of the statements made to him by Chock Hembree, in the absence of the defendant and after the commission of the offenses charged, that the defendant was a coconspirator with said Hembree and Floyd Aikens in the robbery of the Frisco Depot at Antlers and the killing of the agent, and giving details of such robbery and murder. The admission, against the objection of defendant, of the testimony of——that Floyd Aikens, one of the codefendants, had, in the absence of the defendant and after the commission of the offense charged, made to——, that he (Hembree) and the defendant had robbed the Frisco Station at Antlers and killed the agent.

(2) Giving the jury the following instruction:

"Where parties enter into a conspiracy for the purpose of committing a robbery and dividing the proceeds of such robbery among themselves, such conspiracy continues and such parties are responsible for the acts of their coconspirators incident to or growing out of such conspiracy and done in pursuance thereof, until they have divided the proceeds of such robbery."

The errors insisted upon by the defendant will be considered in the inverse order in which they are above stated.

The correctness of said instruction so seriously complained of by the defendant is not an open question in this jurisdiction, this court, in *Holmes v. State,* 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300, having approved an instruction in the identical language of the one complained of, which instruction was doubtless copied from *Holmes v. State, supra.*

In *Grayson v. State,* 12 Okla. Cr. 226, 154 Pac. 334, Judge Doyle, Presiding Judge, speaking for the court, approved the above-cited holding in *Holmes v. State, supra,* and says:

"And where a conspiracy embraces not merely a series of unlawful acts, but also extends to a division of the fruits and profits of such acts among the conspirators, anything said or done by them, although after the commission of the unlawful acts, but before a division of the profits of such acts, is admissible against all other conspirators" (citing *Wishard v. State,* 5 Okla. Cr. 610, 115 Pac. 796; *State v. Pratt,* 121 Mo. 566, 26 S. W. 556; *Scott v. State,* 30 Ala. 503).

In the case of *Grayson v. State,* Judge Doyle further says:

"The theory upon which such evidence is admissible is that the conspiracy does not terminate until there has

been a division of its fruits and spoils" (citing *People v. Opie*, 123 Cal. 294, 55 Pac. 989; Wharton's Crim. Ev. [9th Ed.] 698).

Certainly a conspiracy to rob a cash drawer of a depot by three coconspirators authorized the jury to infer that such conspiracy also included a division of the money secured by such robbery.

The evidence in this case, entirely eliminating the statements respectively made by the codefendants Aikens and Hembree as to how said robbery and murder were committed and by whom, shows that there was conspiracy to rob the Frisco Depot at Antlers, and that in the furtherance of said conspiracy Mr. Hearn was most brutally murdered. This leaves but one question for determination: Was the defendant a coconspirator in the commission of said crimes? The peculiar tracks of the defendant's horse being immediately after the commission of said crime found where the defendant's horse had been hitched near the scene of the tragedy, and tracked therefrom some ten miles, going in the direction of Farris, and the defendant seen early on the same morning of the murder going in the direction of Farris riding horseback; that the night of the homicide he borrowed a pistol, giving a false reason for borrowing it; that on the night preceding the murder he was, in company with his codefendants Hembree and Aikens, riding horseback going in the direction of Antlers, and went within ten feet of the said depot and announced that he and others had come to rob the depot, and was dissuaded from so doing, and that he returned to Farris and the next day solicited the witness O'Quinn to join in the robbery, and when O'Quinn declined to join him and others in such robbery the defendant announced that they did not need O'Quinn and intended to rob

the depot that night, which was in fact done; that about 8 o'clock of the night of the tragedy he was called out of a home by and went off with the caller, whom the defendant said afterwards was either Hembree or Aikens; that at about 7 o'clock of the morning of the tragedy, which was committed about four hours previous, which gave defendant ample time to come from Antlers, he appeared at Farris in a very nervous condition and looked like he had been up all night; that after the tragedy he was seen with money of the same denominations and kind of which the depot had been robbed; that the day after the murder he stated that he had about $18, the amount of which the depot had been robbed; his conflicting statements as to where he was the night said crimes were committed; the incriminating statements he made to the lady he visited at McAlester a few days after the tragedy, "that he was in Antlers at the time of the tragedy and saw a man killed there, and that he was within ten feet of the man when he was killed, and that the name of the man killed was Hearn"—clearly point to the defendant as an active agent in the commission of the homicide charged. And when to said evidence is added the fact that the defendant did not testify in his behalf, and did not offer evidence in his defense, except evidence of his previous good character, we are of the opinion that, excluding the entire evidence of the statements made respectively by Hembree and Aikens as to how and by whom the deceased was killed, the guilt of the defendant is shown by legal evidence beyond a reasonable doubt.

The statements made by Hembree and Aikens respectively and not made in the presence of the defendant, as to who committed the homicide charged, and the particulars thereof, including the statement that the defendant

was a conspirator therein, were certainly not made in furtherance of the conspiracy to rob the depot of the Frisco Railroad at Antlers, were mere confessions on the part of Hembree and of Aikens, and such confessions were improperly admitted in evidence. But the evidence, eliminating therefrom the said confessions, showing that the defendant is guilty of the homicide charged, and, after an examination of the entire record, being unable to say that the admission of said confession has probably caused a miscarriage of justice, or has deprived the defendant of some substantial constitutional or statutory right, we are without authority to reverse the judgment rendered, on account of the errors committed in admitting in evidence said confessions, being prohibited from so doing. Section 6005, Rev. Laws 1910. If said confessions of Hembree and Aikens had been in furtherance of the conspiracy to rob the Frisco Depot at Antlers at the time charged in the information, the said conspiracy not having ended by reason of the fact that the proceeds of said robbery had not been divided among the conspirators, the admission of said confessions would have been free from error.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.